**In re BEVERAGE ENTERPRISES, INC. (jointly administered with Pocono Springs Company, Bankruptcy No. 97–13535DAS) Debtor**

**Bankruptcy No. 97–13534DAS.**

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

Sept. 29, 1998.

Douglas N. Candeub, Philadelphia, PA, for Debtor.

Magdeline D. Coleman, Sagot, Jennings & Sigmond, Philadelphia, PA, for Teamsters Local No. 830.

Charles M. Golden, Obermayer Rebmann Maxwell & Hibbel, LLP, Philadelphia, PA, for Creditors' Committee.

Frederic Baker, Philadelphia, PA, Ass't. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The present posture of the instant proof of claim litigation arising in the above-captioned bankruptcy case requires us to determine whether a claim under the Worker Adjustment and Retraining Notification Act ("the WARN Act") arising due to post-petition actions of the Debtor is entitled to priority status. We hold, consistent with the Union-claimant's position on the issue, that this claim is entitled to administrative priority as an actual, necessary cost and expense of preserving the Debtor's estate pursuant to 11 U.S.C. §§ 507(a)(1) and 503(b)(1)(A). Therefore, we will schedule a status hearing to determine how we will proceed in liquidating this claim, as is necessitated by our decision.

### B. PROCEDURAL AND FACTUAL HISTORY

BEVERAGE ENTERPRISES, INC. ("the Debtor"); its parent company, POCONO SPRINGS COMPANY ("Pocono"); and Purity Water Company, another related company whose case was ultimately dismissed, all filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code on March 25, 1997. Pocono was and remains, on a reduced scale, a producer and distributor of water from natural springs under a plan confirmed in a decision of June 24, 1998, reported as *In re Pocono Springs Co.*, 1998 WL 342048 (Bankr.E.D.Pa. June 24, 1998). *See also In re Pocono Springs Co.*, 1998 WL 151423 (Bankr.E.D.Pa. March 25, 1998) (denying confirmation of a predecessor plan).

The Debtor was, at the commencement of this case, a distributor of Pocono's water and numerous other non-alcoholic beverages. According to the Debtor, its demise resulted from actions of Hornell Brewing Co. ("Hornell") in illegally terminating a contract exclusively licensing the Debtor to distribute Arizona Iced Tea products in the Philadelphia area in March 1997, as described in a lawsuit in which decisions were reported at *In re Pocono Springs Co.*, 1997 WL 347906 (Bankr.E.D.Pa. June 18, 1997) ("*Pocono I*"); and *In re Beverage Enterprises, Inc.*, 1997 WL 177352 (Bankr.E.D.Pa. April 7, 1997). These decisions permitted damages suits against Hornell to go forward, but denied the Debtor's request for injunctive relief restoring its distribution license with Hornell. Ultimately, the Debtor's litigation in this court against Hornell was settled for a total payment of approximately $1,000,000.

The *Pocono I* decision also granted conditional, prospective relief from the automatic

stay in favor of Dr. Pepper/Seven Up, Inc. ("DPSU"), the licensee of what had been the Debtor's largest beverage distribution license. As a result of this decision, we entered an order shortly thereafter approving the sale of DPSU's to Canada Dry Delaware Valley Bottling Company. Ultimately, the Debtor confirmed a liquidating Chapter 11 plan on March 13, 1998.

Upon consummation of the sale of DPSU's license, a sales agreement was executed. Thereafter, on or about June 29, 1997, the Debtor's employees were issued notices of termination of their employment as of July 3, 1997. The employees were paid only through and including July 4, 1997.

On October 1, 1997, Teamsters Local Union 830 ("the Union"), the representative of most of the Debtor's employees, filed a proof of claim, docketed as No. 137 ("the Claim"), asserting that the Debtor committed a violation of the WARN Act by failing to provide 60 days notice of its plant closing to its employees. The claim asserted that the Union, on behalf of its members who were former employees of the Debtor, was entitled to damages in an unliquidated priority claim in an amount exceeding $100,000.00. We note that the Union now estimates this claim at $800,000.

On July 20, 1998, the Debtor filed an objection ("the Objection") to the Claim. In the Objection the Debtor alleged principally that the Union's asserted administrative claim was invalid on the ground that the Debtor's notice was adequate and sufficient under the "faltering business" exception referenced in the WARN Act at 29 U.S.C. § 2102(b)(1).

A hearing on the Objection was scheduled on August 26, 1998. At that time, the Debtor asserted two new issues: (1) the Union lacked standing to assert the Claim; and (2) the Claim was properly classified as either a general unsecured claim or an unsecured priority claim for "wages" under 11 U.S.C. § 507(a)(3) and not as an administrative claim. The Union sought discovery to support the Claim, which the Debtor resisted. The parties ultimately agreed that, since funds would be available to pay the Claim only if it were classified as an administrative claim, the parties should brief the two new issues raised by the Debtor prior to conducting discovery and a hearing on the merits of the Claim.

These briefs were due on September 16, 1998, but the parties both submitted their respective briefs early. In its brief, the Debtor conceded, in light of the decision in *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996), that the Union did in fact have standing to assert the Claim, leaving the proper classification of the claim as the only viable issue.

## C. DISCUSSION

The determination of the sole remaining issue as to whether the Claim constitutes a priority administrative expense requires interpretation of § 2104(a)(1)(A)(i), (ii) of the WARN Act and §§ 507(a)(1) and 503(b)(1)(A) of the Bankruptcy Code. These laws read as follows:

**§ 2104. Administration and enforcement of requirements**

(a) Civil actions against employers

(1) Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of each closing or layoff for -

(A) back pay for each day of violation at a rate of compensation not less than the higher of the average regular rate received -

(i) by such employee during the last 3 years of the employee's employment; or

(ii) the final regular rate received by such employee....

**§ 507. Priorities**

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title ...

## § 503. Allowance of administrative expenses

(b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of expenses of preserving the estate, including wages, wages, salaries, or commissions for services rendered after the commencement of the case. . . .

The Debtor asserts that the Claim is not entitled to administrative priority under §§ 507(a)(1) and 503(b)(1)(A) of the Code because WARN Act "back pay" liability does not constitute "wages." In support of this argument, it relies, initially, on *United Steelworkers of America, AFL–CIO–CLC v. North Star Steel Co.,* 5 F.3d 39 (3d Cir.1993); and *Georgia–Pacific Corporation v. Unemployment Compensation Bd. of Review,* 157 Pa.Cmwlth. 651, 630 A.2d 948 (1993). These decisions, according to the Debtor, establish that WARN Act "back pay" liability payments are damages owed employees for suffering an unexpected employment loss where they had a rightful expectation of continued employment rather than "wages." *See North Star, supra,* 5 F.3d at 43 ("WARN uses the term 'back pay' simply as a label to describe the daily rate of damages payable"); and *Georgia–Pacific, supra,* 157 Pa.Cmwlth. at 667, 630 A.2d at 956–57.

Next, the Debtor argues that the Union's claim does not qualify as a § 503(b)(1)(A) administrative expense because WARN Act "back pay" liability is not based on services rendered. Again, the Debtor relies on *Georgia–Pacific, supra,* 157 Pa.Cmwlth. at 665, 630 A.2d at 955 ("WARN payments, although made 'with respect to' the claim weeks at issue, were not made in recognition of any services claimants performed for G–P either during those weeks or at any other time"). The Debtor also cites *In re Palau Corp.,* 18 F.3d 746, 750 (9th Cir.1994); *In re Eagle Bus Mfg., Inc.,* 158 B.R. 421 432–34 (S.D.Tex. 1993); and *In re Continental Airlines, Inc.,* 148 B.R. 207, 212 (D.Del.1992), and maintains that these cases support the conclusion that

Congress made it clear that the only "wages" which were to be given priority under § 503(b)(1)(A) were those for services rendered postpetition.

Further, the Debtor maintains that the Claim at issue are not actual and necessary costs of preserving the Debtor's estate and therefore the WARN Act benefits at issue are not otherwise appropriate for administrative expenses classification. In this argument, the Debtor relies on several court decisions stating that administrative expenses must be the actual and necessary costs of preserving the estate for the benefit of its creditors. *See Palau, supra,* 18 F.3d at 750 ("where the employee does not work during the postpetition period, there is no postpetition benefit to the estate and no postpetition conduct to justify the allowance of back pay as an administrative expense"), *quoting In re Dant & Russell, Inc.,* 853 F.2d 700, 706 (9th Cir.1988); *Eagle Bus, supra,* 158 B.R. at 435 ("this Court is of the opinion that to hold 'constructive' wages are to be afforded administrative priority would require the Court to completely ignore the express Congressional directives that expenses afforded administrative priority be for 'actual' and 'necessary' wages, salaries or commissions"); *and Continental Airlines, supra,* 148 B.R. at 212 ("Congress specifically modified costs and expenses with the words actual and necessary. Indeed...the use of the adjective actual expressly precludes a reading which would encompass constructive").

Finally, the Debtor contends that *Reading Co. v. Brown,* 391 U.S. 471, 484, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), holding that costs incidental to the operation of a business are entitled to administrative claim status, is inapplicable in the instant case. In this regard, it once again cites to *Palau, supra,* 18 F.3d at 751 ("*Brown* is inapposite, involving post-petition tort-like conduct resulting in damages," while in the instant case the court was presented with the debtor's conduct "resulting in an imposition of wages 'constructively earned' by a non-working former employee"); and *Continental Airlines, supra,* 148 B.R. at 212 ("not all wage claims are given priority because not all wage claims are necessary for the preservation of the

estate"), as well as to *In re Parke Imperial Canton, Ltd.*, 1994 WL 842777, at *7 (Bankr. N.D.Ohio, Nov. 14, 1994) ("The court does not believe the WARN Act applies in this situation...[t]he court notes that it is rendering the final decision which orders the hotel to close, not the debtor who is fighting to keep it open"). The Debtor concludes, on the basis of this authority, that, since the claim at issue does not represent actual and necessary costs and expenses of preserving the estate for services rendered and the *Reading* decision does not apply, the Claim does not qualify as a priority administrative expense.

The Union, on the other hand, supports its position principally by citation to *In re Hanlin Group, Inc.*, 176 B.R. 329 (Bankr.D.N.J. 1995) ("given the compensatory nature of back pay, [WARN Act benefits] must be in the nature of wages under the Code"), and two cases which hold that prepetition WARN Act benefits are entitled to a priority under 11 U.S.C. § 503(b)(3), *In re Riker Industries, Inc.*, 151 B.R. 823, 826 (Bankr.N.D.Ohio 1993) ("'The statute establishing claim priorities is narrowly construed...[t]he WARN statute is to be construed broadly,'") quoting *In re Cargo, Inc.*, 138 B.R. 923, 926 (Bankr. N.D.Iowa 1992); *id.* at 927 ("Given the purposes of ...WARN...[t]he 'back pay' liability of the employer is comparable to privately negotiated severance pay. As a statutorily imposed form of severance pay, it is 'wages' within the meaning of § 507(a)(3) of the Code"). In sum, the Union contends that the postpetition WARN Act "back pay" liability at issue constitutes post-petition "wages" or liabilities which qualify as a § 503(b)(1)(A) administrative expense.

Not surprisingly, the Union counters the Debtor's argument that the *Reading* decision is inapplicable, citing *Hanlin Group, supra*, 176 B.R. at 334. Thus, the Union argues that, even if we find that WARN Act "back pay" liability is not considered as "wages" for postpetition services, we should nevertheless classify the claim as an administrative expense because persons injured by a debtor-in-possession ("DIP") in its continued operation of the DIP's business are entitled to administrative priority. *See Reading, supra*, 391 U.S. at 477, 88 S.Ct. 1759.

We believe that there is a line of cases cited by neither party nor in *Hanlin Group*, the only precedent addressing the issue of classification of postpetition WARN Act benefits, which settle the issue. These cases address the issue of when post-petition severance pay claims of workers of a DIP are properly classifiable as an administrative expense.

These cases divide severance pay claims into two categories. In the first category is severance pay that is required contractually to be paid an employee when that employee is laid off without being given a predetermined amount of notification. *See, e.g., In re Roth American, Inc.*, 975 F.2d 949, 957 (3d Cir.1992), citing, *e.g., In re Public Ledger*, 161 F.2d 762 (3d Cir.1947); *In re Tucson Yellow Cab Co.*, 789 F.2d 701, 703 (9th Cir. 1986); *In re Health Maintenance Foundation*, 680 F.2d 619 621 (1982); *In re Jeannette Corp.*, 118 B.R. 327, 329–30 (Bankr. W.D.Pa.1990); and *In re Allegheny Int'l, Inc.*, 118 B.R. 276, 278–81 (Bankr.W.D.Pa. 1990). These courts uniformly hold that this type of severance is fully earned at the time of an employee's termination. Therefore, when the employer is in bankruptcy at the time of the layoff, the full amount of the severance pay is deemed to be an administrative expense of the Debtor. *See also In re Miami General Hospital, Inc.*, 89 B.R. 980 (Bankr.S.D.Fla.1988) (granting administrative expense priority to the full amount of severance pay due to an employee under an employment contract which provided payment of severance on termination regardless of length of service or notification).

In the second category is severance pay based solely on the length of the employee's service with the debtor. As the name implies, this category refers to severance pay that is obtainable by an employee solely because of the time that the employee has worked for a particular employer. *E.g., Roth American, supra*, 975 F.2d at 957; *Health Maintenance Foundation, supra*, 680 F.2d at 621; and *Allegheny Int'l, supra*, 118 B.R. at 278–80. Severance pay in this category is granted priority as an administrative expense only to the extent that it is earned during the period of time the employer is in bankruptcy.

■ It is therefore clearly established by the Third Circuit Court of Appeals, which we must follow, as well as uniformly by other courts, that severance pay which arises or is earned from postpetition acts of a DIP is entitled to priority as an administrative claim. WARN Act claims are very closely analogies to severance pay benefits. Because the WARN Act Claim at issue arises or was earned as a result of events which unquestionably took place postpetition, it seems clear that Third Circuit precedent supports the conclusion that the WARN Act claims of the Union at issue are indeed entitled to administrative claim status.

The arguments and authorities cited by the Debtor cannot overcome this conclusion. The *North Star* and *Georgia–Pacific* holdings have little bearing on the issue. Far more pertinent is the principle, established ever since the decision in *Public Ledger, supra,* 161 F.2d at 770–71, that severance benefits in lieu of notice constitute wages under the pertinent bankruptcy law. Nothing in *North Star* or *Georgia–Pacific* contradicts or diminishes the conclusion that WARN Act benefits are compensatory in nature, irrespective of whether they fail to exactly duplicate the amount of an ex-employee's salary.

With respect to the issue of whether or not WARN Act benefits are "wages," much can be said for the Union's position that they are. In broad outline, the WARN Act provides that, when an employer which orders a plant closing without the required sixty days' advance notice, that employer is liable to the affected employees for back pay and benefits. 29 U.S.C. §§ 2101(a)(1), 2101(a)(8), 2101(a)(5), 2102(a), and 2104(a)(1)(A). The Act's legislative history makes it clear that Congress intended the "back pay" language in WARN to connote the traditional "back pay" remedy as discussed in *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). According to that case, "back pay" means a "a payment...of a sum equal to what [an employee] normally would have earned" absent a violation of the statute. *Id.* at 197, 61 S.Ct. 845. Accordingly, WARN Act violations "are to be measured by the wages... the employee would have received had the plant remained open." S.REP. NO. 62, 100th Cong., 1st Sess. 24 (1987). In light of the Act's legislative history, bankruptcy courts have consistently held that where a WARN Act violator seeks bankruptcy protection, the statutory liability for "back pay" is a liability for wages. *See, e.g., Saxion v. Titan–C–Manufacturing, Inc.,* 86 F.3d 553, 561 (6th Cir.1996). Such reasoning is utilized by the courts in *Cargo,* 138 B.R. at 926–28; and *Riker Industries,* 151 B.R. at 824–25.

However, assuming *arguendo*.that WARN Act benefits are not properly designated as "wages," we note, as the court stated in *In re Crouthamel Potato Chip Company,* 52 B.R. 960, 967 (E.D.Pa.1985), *rev'd on other grounds,* 786 F.2d 141 (3d Cir.1986), that

[w]ages and commissions for service rendered after the petition has been filed are identified by § 503(b)(1) as merely "included" within the broader class of "actual, necessary costs and expenses of preserving the estate." Thus, once the conclusion is reached that a claim does not fall within the explicitly listed category of wages for services rendered after the commencement of the case, *it is still necessary to consider whether the claim would fit within the broader class of actual and necessary costs of preserving the estate.* To make that determination, the court must consider (1) whether the claim is for costs incurred post-petition which were necessary for the preservation of the estate or provided some benefit to the estate and (2) whether the claim results from a transaction or relationship between the debtor in possession and the creditor as distinguished from expenses resulting solely from pre-petition relationships between the debtor and the creditor (emphasis added).

The cases cited by the Debtor, *e.g., Palau, Eagle Bus, Continental,* and *In re Wheeling–Pittsburgh Steel Corp.,* 113 B.R. 187 (Bankr. W.D.Pa.1990) *vacated as moot,* 147 B.R. 874 (W.D. Pa.1992), which it argues hold to the contrary, are easily distinguishable on the § 507(a)(1) issue. In each of these cases an employer allegedly committed a prepetition unfair labor practice against an employee who subsequently prevailed in proceedings

before the NLRB and was granted back wages which would have extended into the postpetition period. Thus, each of those cases involved prepetition claims. The WARN Act liability presently at issue is a postpetition claim, resulting from solely post-petition conduct of the Debtor.

 By arguing that WARN Act liability is not "wages," the Debtor is actually lending support to the alternate argument that such a claim is an administrative expense under the *Reading Co.* paradigm regarding postpe-tition damage awards. If sums due under the WARN Act are not classifiable as wages, then same must be in the nature of damages paid in compensation for post-petition inju-ries, which are properly classified as adminis-trative claims. *See, e.g., In re N.P. Mining Co.,* 963 F.2d 1449, 1454–56 (11th Cir.1992); and *In re B. Cohen & Sons Caterers, Inc.,* 143 B.R. 27 (E.D.Pa.1992).

### D. *CONCLUSION*

For all of the foregoing reasons, we are compelled to deny the Debtor's argument that the Claim is not properly classified as an administrative claim. We will therefore schedule the matter for a status hearing on October 7, 1998, to determine how the discov-ery which the Union contends is a prerequi-site to the final hearing on the Objection shall take place and when that hearing will be scheduled.

### *ORDER*

AND NOW, this 29th day of September, 1998, upon consideration of the parties' argu-ments and briefs relative to the proper classi-fication of the proof of claim, No. 137, filed by Teamsters Local Union No. 830 ("the Claim"), it is hereby ORDERED as follows:

1. The Claim is deemed properly classi-fied as a priority claim pursuant to 11 U.S.C. §§ 507(a)(1) and 503(b)(1)(A).

2. A status conference to establish a schedule for relevant discovery and a hearing date for final disposition of the Debtor's ob-jection to the Claim is scheduled on

WEDNESDAY, OCTOBER 7, 1998 AT 9:30 A.M. and shall be held in Bankruptcy

Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.